## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN C. EASTMAN,

*Plaintiff*,

v.

BENNIE G. THOMPSON, *et al.*,

*Defendants*.

No. 1:21-cv-03273-CJN

## **CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants the Honorable Bennie G. Thompson, John Wood, Timothy J. Heaphy, and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Congressional Defendants") respectfully move for an order dismissing Plaintiff John Eastman's Complaint (Dec. 14, 2021) (ECF 1).  For the reasons set forth in the accompanying Memorandum of Points and Authorities, the Complaint should be dismissed with prejudice.

A proposed order is attached.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

May 23, 2022

---

[*] Appearing pursuant to 2 U.S.C. § 5571(a).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN C. EASTMAN,

*Plaintiff*,

v.                                                     No. 1:21-cv-03273-CJN

BENNIE G. THOMPSON, *et al.*,

*Defendants*.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

                                                                                          **Page**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

      A.      The Effort To Overturn The Election And The January 6th Attack ...................... 2

      B.      The Formation Of The Select Committee ................................................................ 5

      C.      The Select Committee's Subpoena To Verizon ...................................................... 6

STANDARD OF REVIEW ........................................................................................ 7

ARGUMENT ............................................................................................................ 7

I.      The Select Committee Has A Valid Legislative Purpose And Is Validly
      Constituted ................................................................................................................ 7

II.     The Stored Communications Act Does Not Limit The Select Committee's
     Authority To Obtain Non-Content Information From Verizon Pursuant To A
     Lawful Subpoena .................................................................................................... 18

III.    Plaintiff Fails To State A Proper Constitutional Challenge To The Subpoena ............... 19

      A.      The Subpoena Does Not Violate Plaintiff's First Amendment Rights ................ 19

      B.      The Subpoena Does Not Violate Plaintiff's Fourth Amendment Rights .............. 21

IV.    The Subpoena Does Not Seek Information Protected By The Attorney-Client
    Privilege Or The Work Product Doctrine ........................................................................ 24

CONCLUSION ........................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................7

*Barenblatt v. United States,*
  360 U.S. 109 (1959)..............................................................................................20

*\*Barker v. Conroy,*
  921 F.3d 1118 (D.C. Cir. 2019).......................................................................9, 17

*Barry v. U.S. ex rel. Cunningham,*
  279 U.S. 597(1929).................................................................................................9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................7

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
  860 F.2d 346 (9th Cir. 1988). .............................................................................21

*Buckley v. Valeo,*
  424 U.S. 1 (1976)...........................................................................................20, 21

*\*Budowich v. Pelosi,*
  No. 21-cv-3366 (D.D.C.) ...........................................................................8, 13, 17

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018)....................................................................................22, 23

*Cause of Action Inst. v. United States Dep't of Just.,*
  330 F. Supp. 3d 336 (D.D.C. 2018) .....................................................................25

*Dir. of Off. of Thrift Supervision v. Ernst & Young,*
  795 F. Supp. 7 (D.D.C. 1992) ...............................................................................25

*Drummond Co., Inc. v. Collingsworth,*
  Nos. 13-mc-80169-JST, 13-mc-80171-JST (N.D. Cal.)........................................25

*Eastland v. United States Servicemen's Fund,*
  421 U.S. 491 (1975)........................................................................................20, 23

*\*Eastman v. Thompson,*
  No. 8:22-cv-00099 (C.D. Cal.) ................................2, 3, 4, 8, 13, 17, 20, 21, 23, 26

ii

*F.T.C. v. Boehringer Ingelheim Pharms., Inc.,*
    778 F.3d 142 (D.C. Cir. 2015). ...............................................................24, 27

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002,*
    318 F.3d 379 (2d Cir. 2003) ..........................................................................25

*In re Lindsey,*
    158 F.3d 1263 (D.C. Cir. 1998) .....................................................................26

*In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n,*
    439 F.3d 740 (D.C. Cir. 2006) ..................................................................26, 27

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010) .......................................................................................21

*McPhaul v. United States,*
    364 U.S. 372 (1960) .......................................................................................23

*Meadows v. Pelosi,*
    No. 21-3217 (D.D.C.) ....................................................................................12

*Rangel v. Boehner,*
    20 F. Supp. 3d 148 (D.D.C. 2013) ..................................................................9

*Repub. Nat'l Comm. v. Pelosi ("RNC"),*
    No. 22-659 (D.D.C.) ..............................................................8, 11, 12, 13, 16

*Senate Permanent Subcomm. v. Ferrer,*
    199 F. Supp. 3d 125 (D.D.C. 2016). ..............................................................20

*Smith v. Md.,*
    442 U.S. 735 (1979)........................................................................................22

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021). ...........................................1, 4, 7, 8, 17, 23

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC,*
    933 F.3d 728 (D.C. Cir. 2019) ......................................................................14

*United States v. Beverly,*
    943 F.3d 225 (5th Cir. 2019) ........................................................................23

*United States v. Chem. Found., Inc.,*
    272 U.S. 1 (1926) .............................................................................................9

*United States v. Deloitte LLP,*
    610 F.3d 129 (D.C. Cir. 2010) ......................................................................25

*United States v. Durenberger*,
    48 F.3d 1239 (D.C. Cir. 1995) ..................................................................13, 14

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ....................................................................9, 13

*Vander Jagt v. O'Neill*,
    699 F.2d 1166 (D.C. Cir. 1982) ..................................................................9, 17

*Viveros v. Nationwide Janitorial Ass'n, Inc.*,
    200 F.R.D. 681 (N.D. Ga. 2000) .........................................................................26

**<u>Statutes</u>**

26 U.S.C. §§ 8001-05 .................................................................................................10

18 U.S.C. § 2701 *et seq.* .............................................................................................18

    18 U.S.C. § 2702 ...........................................................................................18, 19

    18 U.S.C. § 2711 ..................................................................................................19

**<u>Legislative & Constitutional Authorities</u>**

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ......................................................10

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ......................................................10, 14

167 Cong. Reg. H5760 (daily ed. Oct. 21, 2021) ......................................................12

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) .................................................12

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ......................................................12

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) .................................................12

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ........................................................12

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022)...................................................12

H. Rep. No. 109-377 (2006) .......................................................................................11

H. Res. 6, 116th Cong. (2019) ....................................................................................15

H. Res. 10, 117th Cong. (2021) ..................................................................................16

H. Res. 24, 110th Cong. (2007) ..................................................................................15

H. Res. 437, 109th Cong. (2005) ................................................................................11

iv

H. Res. 503, 117th Cong. (2021) ............................................5, 10, 11, 12, 14, 15, 16, 17, 23

H. Res. 730, 117th Cong. (2021) ..................................................................................12

H. Res. 851, 117th Cong. (2021) ..................................................................................12

H. Res. 1037, 117th Cong. (2022) ................................................................................12

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I.........................................................................................................................10, 14

    Rule X ...........................................................................................................................10

U.S. Const., Art. I, § 5, cl. 2..........................................................................................9

## **Other**

8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172.........................14

Black's Law Dictionary (11th ed. 2019).........................................................................14

Glossary of Legislative Terms, https://perma.cc/83HA-3DKY ...................................16

*Jan. 3 Memo on Jan. 6 Scenario*, CNN, perma.cc/B8XQ-4T3Z ...................................3

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about
    Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021),
    https://perma.cc/4JNC-73R2..........................................................................................5

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on
    Republican Recommendations to Serve on the Select Comm. to Investigate
    the Jan. 6th Attack on the U.S. Capitol (July 21, 2021),
    https://perma.cc/B86B-SJTA ........................................................................................6

## INTRODUCTION

In this lawsuit, Plaintiff John Eastman seeks to prevent Verizon Communications, Inc. from complying with a subpoena issued by the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol.  Plaintiff provides no valid basis for this Court to thwart a Congressional committee's investigation into "the single most deadly attack on the Capitol by domestic forces" and evaluation of the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business."  *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *injunction denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022).

Plaintiff played a pivotal role in the effort by the former President of the United States to remain in office by obstructing Congress's count of the electoral votes.  Not only was Plaintiff an advisor to the President and a primary champion of the plan to disrupt the electoral vote count, but he also spoke at the rally on the morning of January 6th, spreading proven falsehoods to the tens of thousands of people attending that rally.  Based on the documents the Select Committee has thus far obtained in another lawsuit relating to Plaintiff, Plaintiff appears to have had a broad and central role with regard to many aspects of the Select Committee's investigation.  The Select Committee requires a detailed understanding of all of Plaintiff's activities during the relevant period—including the telephone records at issue here—to inform Congress's legislative judgments and to help ensure that no President can threaten the peaceful transition of power again.

All the claims in Plaintiff's complaint fail.  *First*, Plaintiff is wrong that the Select Committee lacks a legitimate legislative purpose or is invalidly constituted.  Every court that has considered these arguments has rejected them.  *Second*, to the extent Plaintiff raises a claim regarding the Stored Communications Act, that Act does not prohibit the Select Committee's

lawful subpoena seeking non-content information.  *Third*, Plaintiff's First and Fourth Amendment rights are not violated by the subpoena.  *Fourth*, the attorney-client privilege and work-product doctrine do not shield the information encompassed by the subpoena.

In short, the Complaint presses a variety of flawed legal claims to frustrate the Select Committee's efforts to understand fully, and to prevent a recurrence of, the January 6th attack. The Court should dismiss the Complaint in its entirety, as a matter of law.

## BACKGROUND

Plaintiff was a central figure in the disruption of the peaceful transfer of power on January 6th.  Plaintiff spoke at the rally leading up to the Capitol attack, and he was the primary architect of the plan for the Vice President to illegally refuse to count certified electoral votes on January 6th.  Indeed, a federal district court recently outlined the broad extent of Plaintiff's involvement in the effort to overturn the election and the resulting attack.  As the court put it, Plaintiff and President Trump "launched a campaign to overturn a democratic election, an action unprecedented in American history.  Their campaign was not confined to the ivory tower—it was a coup in search of a legal theory."  *Eastman v. Thompson*, No. 8:22-cv-00099, 2022 WL 894256, at *27 (C.D. Cal. Mar. 28, 2022).

### A.    The Effort To Overturn The Election And The January 6th Attack

In the months following the 2020 election, Plaintiff "helped foster" the debunked belief that "the election was tainted by fraud, disregard of state election law, misconduct by election officials and other factors."  *Id*. at *1.  In late December, Plaintiff wrote a memorandum proposing that Vice President Mike Pence refuse to count certified electoral votes from states contested by the Trump campaign.  *See id.* at *3.  On January 3, 2021, Plaintiff drafted a six-page memorandum that expanded on his earlier plan: the memorandum outlined "four potential scenarios for January 6, only some of which would lead to President Trump winning re-

election," *id.*, and ultimately recommended that Vice President Pence disrupt the electoral vote count "without asking for permission—either from a vote of the joint session or from the Court."[1]  The next day, President Trump and Plaintiff hosted a meeting in the Oval Office with Vice President Pence, the Vice President's counsel, and the Vice President's Chief of Staff.  *See Eastman*, 2022 WL 894256, at *3.  At that meeting, Plaintiff presented his plan for Vice President Pence to refuse to count certified electoral votes.  *See id.*  "When Vice President Pence was unpersuaded, President Trump sent [Plaintiff] to review the plan in depth with the Vice President's counsel on January 5."  *Id*. at *20.

Notably, Plaintiff "admitted more than once that 'his proposal violate[d] several provisions of statutory law,' including explicitly characterizing the plan as 'one more relatively minor violation' of the Electoral Count Act."  *Id.* at *24.[2]  On January 5, Plaintiff "conceded that the Supreme Court would unanimously reject his plan for the Vice President to reject electoral votes."  *Id*.  Plaintiff's plan "not only lacked factual basis but also legal justification."  *Id.* at *22.  Plaintiff's memorandum outlining his plan "declared [Plaintiff's] intent to step outside the bounds of normal legal practice: 'we're no longer playing by Queensbury Rules.'"  *Id*.

On January 6, 2021, Plaintiff spoke at the rally outside the White House before tens of thousands of individuals who had gathered to protest the transition of power from President Trump to President Joseph Biden.  *See id.* at *4.  President Trump's personal attorney, Rudy Giuliani, introduced Plaintiff as the "professor who would explain . . . what happened last night, how they cheated, and how it was exactly the same as what they did on November 3."  *Id*. (internal quotation marks and citation omitted).  Plaintiff then declared to the crowd:

---

[1] *Jan. 3 Memo on Jan. 6 Scenario*, CNN, perma.cc/B8XQ-4T3Z.

[2] Quoting Greg Jacob Deposition Transcript at 127, *Eastman*, ECF 160-8; email from John Eastman to Greg Jacob (Jan. 6, 2021, 9:44 pm MST) at 2, *Eastman*, ECF 160-16.

> [A]ll we are demanding of Vice President Pence is this afternoon at
> 1:00 he let the legislators of the state look into this so we get to the
> bottom of it, and the American people know whether we have
> control of the direction of our government, or not.  We no longer
> live in a self-governing republic if we can't get the answer to this
> question.  This is bigger than President Trump.  It is a very essence
> of our republican form of government, and it has to be done.  And
> anybody that is not willing to stand up to do it, does not deserve to
> be in the office.  It is that simple.

*Id.*  (citation omitted).

When President Trump then took the podium, he praised Plaintiff and the plan for Vice

President Pence to disrupt the electoral vote count:

> John is one of the most brilliant lawyers in the country, and he
> looked at this and he said, "What an absolute disgrace that this can
> be happening to our Constitution."  Because if Mike Pence does the
> right thing, we win the election.  All he has to do, all this is, this is
> from the number one, or certainly one of the top, Constitutional
> lawyers in our country.  He has the absolute right to do it.

*Id.* at *5 (citation omitted).

The tragedy that followed is now well known.  "Shortly after the speech, a large crowd of

President Trump's supporters—including some armed with weapons and wearing full tactical

gear—marched to the Capitol and violently broke into the building to try and prevent Congress's

certification of the election results."  *Trump*, 20 F.4th at 18 (citation omitted).  The attack on the

Capitol ultimately "left multiple people dead, injured more than 140 people, and inflicted

millions of dollars in damage to the Capitol."  *Id*. at 15.  Law enforcement eventually cleared the

rioters, and the electoral count successfully resumed later that night after a nearly six-hour delay.

Plaintiff's "plan spurred violent attacks on the seat of our nation's government, led to the

deaths of several law enforcement officers, and deepened public distrust in our political process."

*Eastman*, 2022 WL 894256, at *27.  Put simply, if Plaintiff's "plan had worked, it would have

permanently ended the peaceful transition of power, undermining American democracy and the Constitution." *Id.*

### B.     The Formation Of The Select Committee

In response to the unprecedented attack on the Capitol, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol." H. Res. 503, 117th Cong. § 1 (2021). The resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary." H. Res. 503 § 4(a)(1)-(3).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." H. Res. 503 § 2(a). Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican and then consulted with the House Minority Leader, who recommended five additional Republicans.[3] The Speaker then spoke with the Minority Leader, advised that she would appoint three of those he had recommended, and asked the Minority Leader to recommend two other Republicans.[4] After the Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the

---

[3] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA.

[4] *See id.*

Speaker named an additional Republican to the Select Committee.  *See* Compl. ¶¶ 42-43.[5]  Since

then, the Select Committee has functioned with seven Democrats and two Republicans.

      **C.**      **The Select Committee's Subpoena To Verizon**

      In furtherance of its duty to investigate the facts, circumstances, and causes of the attack

on January 6th, the Select Committee has issued subpoenas to various government agencies,

private companies, and certain individuals.  The Select Committee served Verizon with a

subpoena seeking subscriber information, connection records, and records of session times and

durations of calls for the period of November 1, 2020, through January 31, 2021, for Plaintiff's

Verizon account.  *See* Compl. Ex. 2.  The subpoena did not seek communications content or

geolocation data.  *See id.*

      On December 14, 2021, Plaintiff filed this suit against the Congressional Defendants and

Verizon.  Plaintiff asks this Court to declare that: "the information sought by the subpoena at

issue is in furtherance of law enforcement rather than legislative purposes"; "violates the First

Amendment rights to freedom of speech, association, assembly, and petition of Plaintiff and

those with whom he has been associating"; "violates the Fourth Amendment right to be free from

unreasonable searches and seizures"; and "the [Select] Committee is constituted in violation of

House Rules, and that any actions taken by the Committee are therefore *ultra vires*."  Compl.

Prayer for Relief ¶¶ a-d.  Plaintiff also asks this Court to issue an injunction "enjoining the

Defendants and the [Select] Committee from enforcing its subpoena [and] . . . enjoining Verizon

from complying with Chairman Thompson's subpoena."  *Id.* ¶¶ e-f.

---

[5] *See also* Press Release, Kevin McCarthy, House of Representatives, McCarthy
Statement about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021),
https://perma.cc/4JNC-73R2.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Rule 12(b)(6), Plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**ARGUMENT**

Plaintiff's Complaint does not state a claim on which relief can be granted.  Plaintiff's various theories are all flawed.  *First*, the D.C. Circuit has already held that the Select Committee has a valid legislative purpose.  That purpose undoubtedly encompasses records of Plaintiff's communications on and around January 6th.  And as other federal courts have held, the Select Committee is validly constituted.  *Second*, the Stored Communications Act does not govern the legislative subpoena at issue here, which seeks non-content information.  *Third*, Plaintiff's First and Fourth Amendment claims fail.  *Fourth*, attorney-client privilege does not shield the information the subpoena seeks.  This suit should therefore be dismissed.[6]

**I.      The Select Committee Has A Valid Legislative Purpose And Is Validly Constituted**

1.  The D.C. Circuit recently held that "the January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had." *Trump*, 20 F.4th at 41 (internal quotation marks and citation omitted).  In reaching this holding, the Court described "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations." *Id.* at 17.  Applying the D.C Circuit's decision in *Thompson*, three other courts have rejected arguments—nearly identical to Plaintiff's arguments here—that the Select Committee

---

[6] Plaintiff has agreed to file a voluntary motion to dismiss Select Committee staff members Timothy J. Heaphy and John Wood from this lawsuit.

lacks a legitimate legislative purpose.  *See Repub. Nat'l Comm. v. Pelosi ("RNC")*, No. 22-659, 2022 WL 1294509, at *16-19 (D.D.C. May 1, 2022), *appeal pending*, No. 22-5123 (D.C. Cir.); Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-cv-3366 (D.D.C. Jan. 20, 2022), ECF 27; Order Denying Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal. Jan. 25, 2022), ECF 43.

Nonetheless, Plaintiff's complaint repeatedly insists that the Select Committee does not serve a legislative purpose.  Plaintiff asks this Court to declare that the information sought by the subpoena at issue is in furtherance of law enforcement rather than legislative purposes and that the subpoena is therefore invalid and unenforceable.  *See, e.g.*, Compl. ¶¶ 7, 37, 106; Compl. *Prayer for Relief ¶ a.*  But the Select Committee is not criminally investigating Plaintiff or anyone else—nor is the Select Committee, by investigating the January 6th attack, trying to "expose [information] for the sake of exposure."  Compl. ¶ 22 (internal quotation marks and citation omitted).  Indeed, the D.C. Circuit rejected this very argument:

> The Committee's announced purpose is to "issue a final report to the House containing such findings, conclusions, and recommendations" for such "changes in law, policy, procedures, rules, or regulations" as the Committee "may deem necessary[.]" H.R. Res. 503 § 4(a)(3), (c). . . . The mere prospect that misconduct might be exposed does not make the Committee's request prosecutorial.  Missteps and misbehavior are common fodder for legislation.

*Trump*, 20 F.4th at 42.  That holding governs here.

2.  Plaintiff's complaint also alleges that the Select Committee was not validly formed and lacked authority to issue the subpoena to Verizon for Plaintiff's records.  *See* Compl. ¶¶ 38-57.  Plaintiff is wrong on both scores.

As an initial matter, Plaintiff's demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution

violates Constitutional separation of powers principles.  The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  It is settled law in this circuit that the Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).  As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given [courts'] respect for a coequal branch of government, for [a federal court] to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (internal quotation marks omitted).

In addition, Plaintiff's arguments ignore the presumption of regularity due Congress.  *See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.").  None of the allegations in the Complaint comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

Regardless, Plaintiff's challenges to the Select Committee's composition and subpoena authority are deeply flawed.

*First*, Plaintiff's complaint contends that Speaker Nancy Pelosi's appointment of 9 members to the Select Committee was "contrary to the authorizing resolution, which provides that the Speaker 'shall' appoint 13 members to the Committee."  Compl. ¶ 55.  Plaintiff is incorrect.

9

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules") (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31). The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here. *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."). And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House." 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Plaintiff's attack on the composition of the Select Committee fails. House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 § 2(a). The Resolution does not require that *all* thirteen Members be appointed in order for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, the House's interpretation of its rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members. Specifically, in the 109th Congress, the House created the Select Committee to

Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]").  Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members).  Notably, that select committee likewise issued subpoenas.  *See id.* at 23 (noting that the Katrina Select Committee issued a subpoena to the Department of Defense, and that the Department complied).  This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies" but provides no specific timeline for filling them.  *See* H. Res. 503 § 2(c).  Nor does House Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members.  *See id.*

It is thus no surprise that every district court to have considered Plaintiff's argument has rejected it.  As Judge Kelly of this district recently explained, "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas."  *RNC*, 2022 WL 1294509, at *15.  Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges raised by the Plaintiff here.

For example, when the full House debated the resolutions recommending referral of Steve Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[7]  The full House nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[8]  The interpretive arguments Plaintiff now presents have thus been rejected by the Select Committee, the Rules Committee, the Parliamentarian, the Speaker, and the full House of Representatives. The full House's ratification of the referrals reinforces that Plaintiff's objections to the Select Committee's composition cannot be accepted.

In rejecting the argument that House rules mandated that the Speaker appoint thirteen Members to the Select Committee, Judge Kelly further explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select

---

[7] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate.  It has violated its own rules of creation.  It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6.  You can't have a committee to find out what happened because you are interested.  You can't do that. And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Steve Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose") (statement of Rep. Banks).

[8] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee, and approved by the full House.  *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

Committee is not conclusive as to whether thirteen members are required for it to lawfully operate." *RNC*, 2022 WL 1294509, at *15.  Judge Kelly concluded that if he accepted the argument (which is identical to Plaintiff's argument) about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than … the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Id.* (quoting *Rostenkowski*, 59 F.3d at 1306-07).[9]

Before the decision in *RNC*, two other district courts rejected the same challenge that Plaintiff brings here concerning the composition of the Select Committee.  In *Budowich v. Pelosi,* Judge Boasberg held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 34, *Budowich*, ECF 27.

Shortly thereafter, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order at 9 & n.12, *Eastman*, ECF 43 (quoting *United States v. Durenberger*, 48

---

[9] In *RNC v. Pelosi*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest."  2022 WL 1294509, at *2  (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF 15.

F.3d 1239, 1244 (D.C. Cir. 1995)).  The same deference applies here, and it forecloses Plaintiff's arguments.

*Second*, Plaintiff complains that the Minority Leader did not recommend the Republican Members of the Select Committee.  *See* Compl. ¶ 54.  But the power to appoint Members to select committees rests exclusively with the Speaker of the House.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments").

House Resolution 503 is consistent with that practice.  When creating the Select Committee, the House required that five Members be chosen "after *consultation* with the Minority Leader." H. Res. 503 § 2(a) (emphasis added).  This language provides the Speaker greater authority regarding the appointment of minority party Members than, for example, either language authorizing the Minority Leader to directly appoint a certain number of Members, or language requiring that appointments be made "upon the recommendation of the Minority Leader."  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of.'") (internal quotation marks omitted); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").  The Minority Leader's refusal to consult further after the Speaker declined to appoint two of his recommendations does not alter the authority of House Resolution 503.  Neither the Speaker nor the full House have interpreted House Resolution 503 to allow the Minority Leader to

unilaterally frustrate the operation of the Select Committee.  Indeed, no reasonable interpretation of House Resolution 503 would so allow.

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past.  *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis requirement that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress).  Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so. *See*, *e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted.  *See* Compl. ¶ 4 (alleging only that "[t]he Speaker did not engage in *meaningful* consultation with the minority leader" (emphasis added)).  The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021, Order of the House; and House Resolution 503— made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

*Third*, Plaintiff alleges that "Chairman Thompson did not consult with the ranking minority member of the committee before sending the subpoena[], because there is no ranking minority member of the committee."  Compl. ¶ 64.  The consultation requirement has been satisfied (*see infra* at p. 16), but regardless that requirement applies only to subpoenas for *depositions*: "The chair of the Select Committee, upon consultation with the ranking minority

member, may order *the taking of depositions*, including pursuant to subpoena."  H. Res. 503

§ 5(c)(6)(A) (emphasis added); *see also* Compl. ¶¶ 47-50 (discussing House rules relating to the

taking of depositions).  The subpoena to Verizon attacked by Plaintiff calls only for production

of records by Verizon; no deposition is involved.

 Even if the House Resolution 503 had required consultation for this subpoena, such a

requirement would have been satisfied by the Chair's consultation with Vice Chair Liz Cheney.

Consistent with House practice and precedent, the term "ranking minority member" means the

first member of the minority party appointed to the Select Committee by the Speaker.  *See, e.g.*,

*Ranking Member*, Glossary of Legislative Terms, https://perma.cc/83HA-3DKY (defining

"ranking member" as "[t]he most senior (though not necessarily the longest-serving) member of

the minority party on a committee"); H. Res. 10, 117th Cong. (2021) (containing ranking

minority member appointments to the standing Committees of the House, colloquially referred to

as "ranking members").

 Representative Cheney, by virtue of being the first minority party Member appointed to

the Select Committee, is, by definition, the senior ranking minority member of the Select

Committee.  Accordingly, pursuant to the House's longstanding interpretation of "ranking

minority member," the consultation requirements of House Resolution 503 are satisfied by

consultation with Vice Chair Cheney.  And, to the extent there is any ambiguity, the House's

interpretation should control.  *See supra* at pp. 8-9; *RNC*, 2022 WL 1294509, at *16 ("[O]n this

record the Court must defer to the Select Committee's decision to treat Representative Cheney as

the ranking minority member for consultation purposes.").

 *Fourth,* Plaintiff wrongly suggests that the Select Committee's authority is limited to

seeking information from individuals who are believed to "have entered the Capitol" on January

6th or "to be connected with those who did enter in some substantial way." Compl. ¶ 60.  The Select Committee's authority is far broader than Plaintiff suggests.  The Select Committee is charged with investigating and reporting on the "facts, circumstances, and causes relating to" the January 6th attack on the Capitol, and its "interference with the peaceful transfer of power."  H. Res. 503 § 3(1).  As the D.C. Circuit recognized, the Select Committee's investigation could lead to legislation that, for example, "amend[s] the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election."  *Trump*, 20 F.4th at 42.

Plaintiff's information is vital to the Select Committee's investigation into the disruption of the peaceful transfer of power.  As Judge Carter recently summarized the situation, Plaintiff "wrote two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election"; "testified to Georgia state senators regarding alleged voter fraud and . . . argued that the state legislature could reject election results and directly appoint electors"; "spoke at the rally at the White House Ellipse that led into the attack on the Capitol"; and "called Vice President Pence spineless for refusing to follow [Plaintiff's] plan."  Order at 10-11, *Eastman*, ECF 43 (internal quotation marks omitted).  Plaintiff's phone records at issue plainly fall within the bounds of an investigation into "the influencing factors that fomented [the] attack on American representative democracy."  H. Res. 503 § 3(1).

In short, there is no basis for this Court to substitute Plaintiff's interpretation of the Select Committee's authorizing resolution for the House's view; indeed, such a determination would be impermissible and "tantamount to 'making the [House] Rules.'"  *Barker*, 921 F.3d at 1130; *see also* Oral Arg. Tr. at 33-34, *Budowich*, ECF 27; Order at 9 & n.12, *Eastman*, ECF 43; *Vander Jagt*, 699 F.2d at 1175.  The Select Committee and its subpoena are valid.

**II.    The Stored Communications Act Does Not Limit The Select Committee's Authority To Obtain Non-Content Information From Verizon Pursuant To A Lawful Subpoena**

Although certain paragraphs of Plaintiff's complaint suggest that the Select Committee's subpoena to Verizon contravenes the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* (2018), Plaintiff ultimately does not appear to raise such a claim.  *Compare* Compl. ¶¶ 67-69, *with* Compl. Counts I-V.  Regardless, any claim that the subpoena violates the Stored Communications Act is wrong as a matter of law.  Nothing in the Act limits the ability of a Congressional committee to obtain non-content information from a "person or entity providing an electronic communication service to the public" via a lawful subpoena.  18 U.S.C. § 2702(a)(1).

Plaintiff is incorrect to suggest that the subpoena seeks production of the "contents" of communication because it seeks data related to calls and text messages.  Compl. ¶¶ 65-67.  In fact, the subpoena does *not* seek the contents of any communication.  Instead, it merely seeks "subscriber information" and "connection records and records of session times and durations." Compl. Ex. 2 (capitalization omitted).  Subscriber information is limited to information about the user of the account, associated phone numbers, and other identifying numbers.  "Connection records" and "records of session times and durations" simply refer to records of the date and time, duration, and sender and recipient of any call, text message, or other communication.[10]  As Verizon likewise recognizes, the subpoena does not "compel the production of any call or text message content, or location information."  Verizon Answer ¶ 1, ECF 17.

---

[10] Connection Records and Records of Session Times and Durations are defined in the subpoena as, "All call, message (SMS & MMS), Internet Protocol ('IP'), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections."  Compl. Ex. 2.

The Stored Communications Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena.  The Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  18 U.S.C. § 2702(c).  The definition of the term "governmental entity" as used in the Act does not include Congress.  *Id.* § 2711(4).  The Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof," 18 U.S.C. § 2711(4), and Plaintiff concedes that Congress is not a "governmental entity" within that definition.  Compl. ¶ 68.  That concession is dispositive: the Act expressly *permits* disclosure to "any person other than a governmental entity."  18 U.S.C. § 2702(c)(6).

Accordingly, the plain text of the Stored Communications Act forecloses Plaintiff's argument that the subpoena violates the Act.

## III.    Plaintiff Fails To State A Proper Constitutional Challenge To The Subpoena

Plaintiff claims that the Verizon subpoena violates the First and Fourth Amendments.  Compl. ¶ 26.  Those claims fail as a matter of law.

### A.    The Subpoena Does Not Violate Plaintiff's First Amendment Rights

Plaintiff alleges that the subpoena violates his "rights to freedom of association as protected by the First Amendment."  Compl. ¶ 28.  Plaintiff contends that he used his personal cell phone "to engage in protected advocacy and other speech," including privileged and private speech with friends, clients, and family.  *Id.* ¶¶ 88, 89.  In Plaintiff's view, such "associational and expressive activities are protected by the First Amendment."  *Id.* ¶ 90.

To the contrary, the subpoena at issue does not implicate any "associational and expressive activities" of Plaintiff or his associates.  After all, the subpoena does not seek the content of any communications.  *See supra at* pp. 18-19.  Rather, the subpoena seeks subscriber

information, connection records, and records of session times and durations of calls and messages.  Compl. Ex. 2.  None of this data reveals any speech protected by the First Amendment.

Further, any argument that the subpoena implicates Plaintiff's First Amendment rights is foreclosed by *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 509 (1975).  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Id*. at 509 & n.16.  Plaintiff's First Amendment arguments against enforcement of the Select Committee's subpoena accordingly must be dismissed.

Even if Plaintiff's First Amendment claim were subject to a balancing test, it would fail: the balancing of "the competing private and public interests at stake" here plainly favors the Select Committee.  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959); *see* Order at 12-13, *Eastman*, ECF 43 (rejecting Plaintiff's First Amendment claim).  Other courts in this district have rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 138 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring "the free functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (citation omitted).

The Select Committee is doing precisely that by seeking cell phone data for the three-month period surrounding January 6, 2021.  Plaintiff, by contrast, fails to assert any First Amendment interest that could outweigh the very grave public interest here.  His conclusory

assertion that "[a]llowing a highly partisan congressional committee to invade the First Amendment activity of a political opponent would have a chilling effect on free speech," Compl. ¶ 10, is too amorphous to be actionable.  Courts require far more specificity than Plaintiff alleges.[11]

Even if Plaintiff was able to substantiate a legitimate interest implicated by the subpoena, it is far outweighed by the Select Committee's interest.  The Select Committee's subpoena seeks records relevant to determining the root causes of the January 6th insurrection against Congress, a "violent attack[] on the seat of our nation's government" that resulted in the "deaths of several law enforcement officers" and "deepened public distrust in our political process." *Eastman*, 2022 WL 894256, at *27.  This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions." *Buckley*, 424 U.S. at 66 (citation omitted). Accordingly, the complaint fails to state a First Amendment claim on which relief may be granted.

**B.      The Subpoena Does Not Violate Plaintiff's Fourth Amendment Rights**

Plaintiff alleges that the subpoena violates the Fourth Amendment because Plaintiff "has a reasonable expectation of privacy in [his] private cellphone information" and because the subpoena "exceed[s] the lawfully authorized purpose" of the Select Committee.  Compl. ¶ 9; *see also id.* ¶¶ 97-111.  That is incorrect.

---

[11] *See Buckley*, 424 U.S. at 74 (stating that showing an associational injury requires demonstrating "a reasonable probability that the compelled disclosure" "will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears . . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights.").

1.  As a preliminary matter, Plaintiff does not have a reasonable expectation of privacy in the information sought by the Verizon subpoena.  The Supreme Court held in *Smith v. Maryland*, that the government's use of a pen register—a device that recorded the outgoing phone numbers dialed on a telephone—was not a Fourth Amendment search because such records were voluntarily disclosed to the telephone company and there was no reasonable expectation of privacy in them.  442 U.S. 735, 743-44 (1979).  As the Court explained, "[t]elephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes."  *Id.* at 743.  It is thus "too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret."  *Id.*  And, even if an individual did harbor such a subjective expectation, "this expectation is not one that society is prepared to recognize as reasonable."  *Id.* (internal quotation marks and citation omitted).  Plaintiff's Fourth Amendment claim is thus squarely foreclosed by Supreme Court precedent.

The Supreme Court's recent decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), does not alter this conclusion.  There, the Supreme Court held that cell-site location information is subject to Fourth Amendment protections.  *Id.* at 2217.  In so holding, the Court "decline[d] to extend *Smith*" to cover the "novel circumstances" of cell-site location information. *Id.*  But it did not question *Smith*'s holding as to "telephone numbers."  *Id.*; *see id.* at 2220 (stating that the *Carpenter* decision is a "narrow one" that "do[es] not disturb the application of *Smith*").  The Verizon subpoena seeks only subscriber information, connection records, and records of session times and durations; it does not seek historical cell-site location information or the contents or substance of any communications associated with Plaintiff's phone number.  *See*

*supra* at pp. 18-19.  The records sought by the Select Committee, therefore, are governed

squarely by *Smith,* not *Carpenter*.  *See, e.g., United States v. Beverly*, 943 F.3d 225, 239 (5th Cir.

2019) (holding *Carpenter* does not apply to subscriber information and call-detail records and

declining to assume that such records may be used to track location).

2.  Furthermore, the D.C. Circuit recently held in *Trump v. Thompson* that the Select

Committee has a valid legislative purpose in investigating the January 6th attack, emphasizing

that "Congress's power to obtain information is broad and indispensable . . . and encompasses

inquiries into the administration of existing laws, studies of proposed laws, and surveys of

defects in our social, economic or political system for the purpose of enabling the Congress to

remedy them."  20 F.4th at 24 (internal punctuation and citation omitted).  That holding

forecloses Plaintiff's arguments that the subpoena violates the Fourth Amendment because it is

"untethered from any valid legislative purpose" and is too "broad and indefinite."  Compl.

¶¶ 106, 109.  A subpoena is not impermissibly overbroad if its call for documents or testimony is

within the scope of the Congressional inquiry at issue.  *See McPhaul v. United States*, 364 U.S.

372, 382 (1960).

The Select Committee's authorizing resolution charges it to "investigate and report upon

the facts, circumstances, and causes . . . relating to the interference with the peaceful transfer of

power . . . as well as the influencing factors that fomented such an attack."  H. Res. 503 § 3(1).

Given that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate

and is not impermissibly broad.  *See Eastland*, 421 U.S. at 509; *McPhaul*, 364 U.S. at 382; Order

at 13-14, *Eastman*, ECF 43 (rejecting Plaintiff's Fourth Amendment claim).  Plaintiff spoke at

the rally before the Capitol attack, and he was a driving force behind the effort to interfere with

the electoral vote count and overturn the election: he advised then-President Trump on President

Trump's pursuit of an unconstitutional plan to disregard the certified results of the election on

January 6th.  *See supra* at pp. 2-5.  Indeed, any inquiry into the factors that influenced the

disruption of the peaceful transfer of power would be incomplete without Plaintiff's information.

Although the Select Committee has obtained some of Plaintiff's email communications from

Chapman University and public sources, the Select Committee needs the Verizon records at issue

to ensure it has a complete picture of the scope of Plaintiff's efforts to overturn the 2020

Presidential election.  For instance, documents show that Plaintiff was a party to many of the

most important meetings and events leading to the Capitol attack, *see supra* at pp. 2-5, 17;

Plaintiff's phone records would help the Select Committee better understand how those meetings

and events came to pass (by showing who Plaintiff was messaging and calling leading up to

those meetings).

In short, Plaintiff's records are plainly within the ambit of the Select Committee's

inquiry.  Thus, the subpoena is not overbroad and does not violate Plaintiff's Fourth Amendment

rights.

## IV.    The Subpoena Does Not Seek Information Protected By The Attorney-Client Privilege Or The Work Product Doctrine

Plaintiff also complains that the subpoena "does not exempt from disclosure

communications protected by attorney-client privilege or the attorney work product doctrine."

Compl. ¶ 63.  But the information sought from Verizon is not protected by the attorney-client

privilege or work-product doctrine.

*First*, because the information that the subpoena seeks was *prepared by Verizon* in the

ordinary course of its business, Plaintiff's work-product claim fails.  The work-product doctrine

"protects only work performed in anticipation of litigation or for trial.*"  F.T.C. v. Boehringer*

*Ingelheim Pharms., Inc.,* 778 F.3d 142, 149 (D.C. Cir. 2015).  "When considering whether

a document is prepared 'in anticipation of litigation,'" courts ask "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)).  Of course, the subscriber information and connection records Verizon prepared were not prepared in anticipation of litigation.  They were created so that Verizon can profitably carry out its business as a telephone company.  And, the courts have recognized that "the work product doctrine does not extend to documents . . . that were prepared by a third party in the ordinary course of business and that would have been created in essentially similar form irrespective of any litigation anticipated by counsel." *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002,* 318 F.3d 379, 384-85 (2d Cir. 2003); *see also Drummond Co., Inc. v. Collingsworth*, Nos. 13-mc-80169-JST, 13-mc-80171-JST, 2013 WL 6074157, at *1, *2 (N.D. Cal. Nov. 18, 2013).  The subpoena thus does not seek any protected work product.

*Second*, the attorney-client privilege does not protect the non-content information that the subpoena here seeks.  The attorney-client privilege "protects from disclosure confidential communications from clients to their attorneys, as well as communications from attorneys to their clients containing confidential information supplied by the client." *Cause of Action Inst. v. United States Dep't of Just.*, 330 F. Supp. 3d 336, 346-347 (D.D.C. 2018).  The Verizon subpoena seeks only subscriber information and connection records; it does not seek the content of any communications. *See supra* at pp. 18-19.  The mere fact that a communication occurred, and the identity of the participants in that communication, are not privileged—after all, such information is regularly disclosed in privilege logs used to support a privilege claim. *See, e.g., Dir. of Off. of Thrift Supervision v. Ernst & Young*, 795 F. Supp. 7, 13 (D.D.C. 1992).

Nor is the information privileged because it could reveal the identity of Plaintiff's clients. "Under the general rule, the attorney-client privilege does not protect from disclosure the identity of the client . . . and the general purpose of the work performed." *Id.* at 350 (internal quotation marks and citation omitted). Although the privilege may apply "when a client's identity [is] sufficiently intertwined with the client's confidences"—such as where the disclosure of the client's identity would "reveal its motive . . . in seeking [legal] representation," *id.* (internal quotation marks omitted)—there can be no serious argument that the connection records sought here are intertwined with any client confidences. Plaintiff has made no allegation that his clients' phone numbers alone would reveal their motives, or that any "clients sought legal advice regarding their . . . phone numbers." *Viveros v. Nationwide Janitorial Ass'n, Inc.*, 200 F.R.D. 681, 684 (N.D. Ga. 2000). Indeed, as a result of Plaintiff's other suit against the Select Committee in California district court, Plaintiff has sought to support his attorney-client privilege claims by proving the existence of his attorney client relationship with the former President and other actual or potential clients. *See, e.g.*, Pl.'s Br. in Supp. of Privilege Assertions at 10-17, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal., May 19, 2022), ECF 345. This further illustrates the inapplicability of Plaintiff's concern about revealing the identity of clients. Attorney-client privilege does not apply.

Finally, even if the attorney-client privilege or work-product doctrines were applicable, Plaintiff's blanket invocation of those doctrines in his complaint is insufficient. "It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). Accordingly, "[t]he basis of [a] privilege must be adequately established in the record, through evidence sufficient . . . to establish the privilege . . . with reasonable certainty." *In re Subpoena Duces Tecum Issued to*

*Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) (alterations in original) (quotation marks omitted). "This requires the party asserting privilege to adduce competent evidence in support of its claims, something beyond conclusory statements, generalized assertions, and unsworn averments of its counsel." *Boehringer Ingelheim*, 180 F. Supp. 3d at 15-16. All that Plaintiff's complaint musters is that "Plaintiff is an attorney and communicates with clients in part by telephone and text messages." Compl. ¶ 81. That is plainly insufficient. For this reason, too, Plaintiff's privilege claim fails.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

John A. Freedman
Paul Fishman
Amy Jeffress
David J. Weiner
John M. Hindley
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

Dated: May 23, 2022

* Appearing pursuant to 2 U.S.C. § 5571(a).

28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2022, I caused the foregoing Congressional Defendants'
Motion to Dismiss and the accompanying Memorandum of Points and Authorities in Support to
be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I
understand caused a copy to be served on all registered parties.


*/s/ Douglas N. Letter*
Douglas N. Letter